IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 07-cv-02351-PAB
(Consolidated with 07-cv-02412; 07-cv-02454; 07-cv-02465; and 07-cv-2469)

In re Crocs, Inc. Securities Litigation

---

## ORDER ON MOTIONS TO DISMISS

---

This case is before the Court on the Motion of Defendant Deloitte & Touche LLP to Dismiss Plaintiffs' Corrected Amended Consolidated Class Action Complaint [Docket No. 104], defendant Crocs, Inc.'s Motion to Dismiss Plaintiffs' Corrected Consolidated Amended Complaint [Docket No. 107], and Individual Defendants' Motion to Dismiss Plaintiffs' Corrected Consolidated Amended Complaint [Docket No. 108].  Plaintiffs have filed both a response [Docket No. 114] and a corrected response [Docket No. 121] to the motions.  The movants filed a reply in support of each of the three motions to dismiss [Docket Nos. 124, 126, and 127].

This case involves a class action lawsuit alleging violations of the Securities Exchange Act and associated federal rules and regulations against a company (Crocs, Inc.), its auditor and principal accounting firm (Deloitte & Touche), four of its executive officers, two members of senior management, and four members of its board of directors.

This Court has jurisdiction over this case pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

## I.  BACKGROUND

Crocs, Inc. ("Crocs") is a Colorado-based company whose core business is the

manufacture and sale of plastic footwear [Docket No. 87 at ¶ 7].  Crocs was established

in 2002, at which time Crocs sold only a single model of its shoes in six colors [*id.* at

¶ 48].  During 2006, Crocs expanded its product line and began offering various sports

equipment as well as apparel and accessories, including t-shirts, sweatshirts, hats,

beanies, and socks [*id.* at ¶ 49].  By the end of 2006, Crocs had over 5,800 individual

product items, as represented by the over 5,800 stock keeping units ("SKUs") assigned

in Crocs' accounting, warehousing, and point-of-sale systems [*id.* at ¶ 50].  These

products were available at over 11,000 domestic retail store locations and over 8,000

international retail store locations during fiscal year 2006 [*id.* at ¶ 51].

Crocs has manufacturing and warehouse facilities in the United States, Europe,

China, and elsewhere [*id.* at ¶ 7].  During 2006, Crocs obtained its footwear products

from third-party manufacturers in China, Italy, Romania, and the United States, as well

as from Crocs-operated manufacturing facilities in Canada, Mexico, and Italy [*id.* at

¶ 52].  The majority of Crocs footwear was manufactured by Futai in China [*id.*].

Plaintiffs allege that Crocs failed to update its data management systems in an

appropriate fashion considering the rapid growth of the company and its product line [*id.*

at ¶ 53].  Crocs' continued use of inadequate data management systems resulted in

problems managing manufacturing, inventory, sales, distribution and assessment of

current and future demand [*id.* at ¶ 53].  As a result of these problems, Crocs allegedly

manufactured too much product, could not distribute its product efficiently and, hence,

2

experienced a massive inventory buildup [*id.*].  Plaintiffs allege that this inventory

buildup motivated defendants to perpetrate fraudulent schemes to mislead investors

regarding Crocs' financial condition [*id.*].

From late 2006 through at least the third quarter of 2007 during weekly meetings

held at Crocs' Aurora, Colorado warehouse and during nearly daily phone calls,

defendant Scott Crutchfield ("Crutchfield") allegedly learned that, because the

purchasing and planning department did not have accurate data regarding sales, the

department was "bulk ordering" all styles, colors and sizes of shoes, including those

which did not sell [*id.* at ¶¶ 60, 61].  Crocs' inventory increased fourfold from August to

December 2006, increased fourfold in 2007 through the end of the third quarter, and

increased fourfold in the fourth quarter of 2007 and the first quarter of 2008 [*id.* at ¶ 63].

The products in Crocs' Colorado warehouses had a six-month turnaround, an amount

alleged to be six times the industry standard [*id.* at ¶ 64].  The information regarding the

inventory buildup in the Colorado warehouses allegedly was reported in daily e-mail

reports to defendants Crutchfield and John P. McCarvel ("McCarvel") and, likely, to

defendant Ronald R. Snyder ("Snyder") beginning at least in April 2006 [*id.* at ¶ 65].

In these meetings and e-mail correspondence, defendants Crutchfield and

McCarvel discussed the lack of accurate data due to the use of Excel spreadsheets [*id.*

at ¶ 67].  Although modern supply chain management software allows for

manufacturing, sales, and distribution data to be updated on a "real-time" basis,

plaintiffs allege that the Excel spreadsheets used by Crocs allowed for the acquisition of

only outdated and, hence, inaccurate data [*id.* at ¶ 70].  For example, plaintiffs allege

that the spreadsheet generated by Crocs' internal system would show that the warehouses contained none of a type of shoe; however, Crocs employees could see the shoes in the warehouse [*id.* at ¶ 71].  In a similar fashion, data on the amount of a particular shoe in stock would be off by a factor of ten [*id.*].  In addition, single barcodes often were assigned to numerous products, although each barcode was supposed to be assigned to an individual Crocs product in a specific color, style and size [*id.* at ¶ 73].

Plaintiffs allege that senior management engaged in daily discussions with the warehouse and sales staffs regarding the unreliable inventory counts and allocations and about the fact that Crocs could not match orders to available inventory [*id.* at ¶ 72].  The complexity of Crocs' business allegedly required the use of a data management system that included distribution requirements planning, materials requirements planning, and advanced planning systems software [*id.* at ¶ 80].  Crocs purchased an enterprise resource planning system that was intended to assist Crocs' ordering and sales divisions, but this system was not deployed in the logistics, inventory control, and planning departments [*id.* at ¶ 81].  These systems were not upgraded appropriately until 2008 [*id.*].  In addition, Crocs lacked a procedure to verify the entries regarding inventory into the Excel spreadsheets [*id.* at ¶ 76].  This allegedly resulted in a materially incorrect assessment of inventory.

The inventory management problems allegedly led to difficulties fulfilling retailers' orders [*id.* at ¶ 78].  As none of the warehouses had accurate data regarding its inventory and retailers' desired products were often at warehouses on other continents, Crocs' ability to fill orders correctly and in a timely fashion was severely hampered [*id.*].

4

Crocs never had sufficient quantities of the high demand products, it sold out of the most popular styles and colors in late spring or early summer of 2006, and its deliveries for the rest of the summer of 2006 were late [*id.* at ¶ 79(a)].  For example, Crocs allegedly expected high demand for its Athens-style shoe, introduced in 2006, yet ran out of the shoes in March 2006 and never caught up with demand [*id.* at ¶ 79(b)].  In contrast, according to the Complaint, during 2006 and 2007, Crocs ordered large quantities of unpopular shoes, such as shoes in men's sizes but in women's colors (*e.g.* size 13 "fuchsia" and "butter" shoes) [*id.* at ¶ 79(c)].  The Complaint alleges that, in order to meet retailers' deliver-by dates, Crocs had to lease jets to ship shoes on several occasions, an expensive, yet allegedly undisclosed, expenditure [*id.* at ¶ 79(d)].  According to the Complaint, none of these problems were disclosed in a timely fashion [*id.*].

Plaintiffs also allege problems with Crocs' Chinese manufacturers.  Crocs' Chinese manufacturers produced goods improperly or of poor quality ninety percent of the time [*id.* at ¶¶ 82, 86].  The Complaint provides an example of Nordstrom's return of a shipment of 10,000 pairs of Crocs footwear [*id.*].  In addition to these problems, the Chinese manufacturers were selling knockoff, unauthorized copies of Crocs shoes on the black market [*id.* at ¶ 84].  Because of the problems with Crocs' Chinese manufacturers, McCarvel spent the majority of his time from 2006 until the beginning of 2008 in China [*id.* at ¶ 83].  No later than early 2007 Crocs attempted to order its factories in China to operate twenty-four hours a day, seven days a week [*id.* at ¶ 85], which was intended to eliminate the production of knockoff Crocs shoes [*id.*].  Crocs

bought a Futai factory in China in order to stem the production of knockoffs and to meet anticipated demand, but failed to record the purchase on its books [*id.* at ¶ 87].

Crocs also allegedly had problems with distribution in Europe.  From late 2006 through 2007, Crutchfield repeatedly was informed on daily phone calls and in meetings that Crocs' distribution center in Rotterdam was having serious problems moving goods to Europe [*id.* at ¶ 88].  Specifically, Crocs' Rotterdam distribution center delivered shoes at a rate of 25,000 a day, while the distribution center in Aurora, Colorado could deliver at a rate of 100,000 a day [*id.* at ¶ 91].  The Rotterdam distribution center allegedly also had difficulties utilizing the Excel software, contributing to its difficulty filling orders [*id.* at ¶ 92].  As the distribution center in Rotterdam was Crocs' main conduit to the European market, this problem was material to Crocs' ability to sell its products in Europe and allegedly cost Crocs lost sales of between 1 million and 1.5 million shoes in the last half of 2006 through the end of 2007 [*id.* at ¶¶ 91, 93].  During this time frame, Crutchfield regularly reported to Snyder and McCarvel.  The problems with the Rotterdam distribution center were reported to the Individual Defendants [*id.* at ¶ 17].

Plaintiffs allege that Crocs' inventory problems reached crisis levels in the third quarter of 2007.  Plaintiffs allege that, as the inventory continued to build, a very large shipment of size 12 pink Crocs shoes was found at a Chinese warehouse and 10,000 pairs of size 13 sage-colored Crocs shoes were found in Aurora, Colorado in September 2007 [*id.* at ¶ 94].  As a result of the failed launch in July 2007 of apparel and gear lines, inventory from these lines also increased [*id.* at ¶ 95].  In addition, shoes

and apparel were discovered as of August and September of 2007 and through the rest of 2007 in Crocs' Colorado warehouses which were listed as sold, yet contained no listing of a delivery destination [*id.* at ¶ 96]. During the third quarter of 2007, Crocs' senior management informed employees that, although demand for its shoes was decreasing, Crocs anticipated that demand would rebound; therefore, Crocs planned to continue the around-the-clock manufacturing of its shoes in China, Romania, Canada and Mexico [*id.* at ¶ 100]. In order to store the increasing volume of product, Crocs leased six or seven additional warehouses in Aurora, Colorado from third-party companies in August and September 2007 [*id.* at ¶ 102]. The amount of Crocs' excess inventory allegedly exceeded industry standards [*id.* at ¶ 64].

Plaintiffs allege that the data management problems were reported by Crocs employees to their managers by at least September 2007 and that this information was passed up the chain of command [*id.* at ¶ 97]. Plaintiffs allege that in late September 2007 the newly-hired head of Crocs' information technology ("IT") gave McCarvel a written report which was highly critical of problems with the data management system [*id.* at ¶ 98]. The report, along with proposed solutions and attached memoranda, allegedly was circulated to other members of Crocs' management [*id.*].

During the time frame of the alleged concealment of the inadequate data management systems and the resulting inventory buildup, Crocs' stock price increased by 246% from January to October 31, 2007 [*id.* at ¶ 54].

On October 31, 2007, Crocs announced that it had distribution problems as well as a large buildup of inventory; however, plaintiffs allege that only a portion of the

existing problems was revealed [*id.* at ¶ 55].  As a direct result of the partial disclosures, the price of Crocs common stock decreased on the NASDAQ stock market from $74.75 a share on October 31, 2007 to $47.74 a share on November 1, 2007, a decrease of over 36% [*id.* at ¶ 55].  This one-day decrease in the value of Crocs common stock allegedly caused Crocs' management to order an immediate end to the manufacture and importing of many of its shoe lines [*id.* at ¶ 108].  During the fourth quarter of 2007, Crocs stated its desire to reduce its inventory buildup by 20 percent in internal communications such as daily conference calls [*id.* at ¶ 109].

In December 2007, Crocs allegedly conducted a physical count of the products in its warehouses [*id.* at ¶ 110].  During this count, Crocs employees discovered numerous shipments that were supposed to have been shipped out weeks or months prior to the accounting [*id.* at ¶ 110(a)].  Plaintiffs allege that, during this inventory count, Crocs executives ordered trucks filled with unsold shoes to remain in transit during key days of the inventory count in an attempt to conceal the excess inventory [*id.* at ¶ 110(b)].  Moreover, from December 1, 2007 to December 23, 2007, Crocs shipped approximately 400,000 shoes to Rotterdam that Crocs did not include in its inventory count [*id.*].  At least one Crocs compliance officer raised this inventory count problem to McCarvel, who did nothing to stop the deceptive devices allegedly used to exclude inventory from the count [*id.* at ¶ 110(c)].

On April 14, 2008, the price of Crocs common stock closed at $17.79 a share on the NASDAQ exchange [*id.* at ¶ 57].  After the close of the normal trading day on the NASDAQ, Crocs disclosed that its inventory had increased between 5% and 10% in the

three months between December 31, 2007 and March 31, 2008 [*id.* at ¶¶ 57, 112].  The price of Crocs common stock closed at $10.11 a share on the next day, April 15, 2008, a decrease of almost 45% [*id.* at ¶ 57].  Between April 2, 2007 and April 14, 2008, plaintiffs allege that some of the defendants collectively sold 2.8 million Crocs shares having a value of at least $195.6 million [*id.* at ¶ 59].

During the next seven months, the price of Crocs common stock continued to decline.  In November 2008, plaintiffs allege that Crocs disclosed the full truth concerning its financial and inventory problems [*id.* at ¶ 58] and announced that it was taking a write-down of over $70 million of inventory, stating that "[b]ased on current trends we have lowered our projected sales volumes and made the strategic decision to further right-size our operations to better align with our lower volumes and revenues." [*id.* at ¶¶  58, 167].

## II.  PLAINTIFFS' CLAIMS

Plaintiffs have filed the Complaint on behalf of themselves and all persons or entities that purchased and/or acquired securities of Crocs between April 2, 2007 and April 14, 2008, inclusive ("Class Period").  Plaintiffs allege that defendants Crutchfield, Snyder, McCarvel, Russ Hammer ("Hammer"), and Peter S. Case ("Case"), collectively the "Individual Defendants," and Crocs violated Section 10(b) (Count One) and Section 20(a) (Count Two) of the Securities Exchange Act.  Plaintiffs also allege a violation of Section 10(b) by defendant Deloitte (Count Three).  Plaintiffs allege a violation of Section 20(A) of the Securities Exchange Act against Ronald R. Snyder, Peter S. Case, John P. McCarvel, Michael Marks, and Raymond Croghan, as well as against Richard

L. Sharp, Thomas J. Smach, and Michael C. Margolis (the "Insider Trading Defendants"); a violation of Section 20A(c) against Crocs and the Insider Trading Defendants; and a violation of Section 20A(b)(3) against the Insider Trading Defendants (Count Four).

## III.  ALLEGED MATERIAL MISREPRESENTATIONS AND OMISSIONS

Plaintiffs generally allege that all of the Individual Defendants were senior officers of Crocs; each of them had access to the material adverse undisclosed information; each of them directly participated in the management of Crocs and was directly involved in the day-to-day operations of Crocs; and each of them was involved with the drafting, producing, reviewing, signing and/or disseminating the information in the SEC forms and press releases [*id.* at ¶¶ 258-59, 261-62, 265].

### A.  Crocs Form 10-K for the Year Ending December 31, 2006

On April 2, 2007, Crocs filed its SEC Form 10-K for the year ending December 31, 2006 ("2006 10-K") [*id.* at ¶ 113].  This 10-K was signed by Snyder, Case, Michael Marks ("Marks") and Raymond Croghan ("Croghan") and allegedly contained materially false and misleading statements [*id.*].  Page two of the 2006 10-K contains the statement that "[w]e are a rapidly growing designer, manufacturer and marketer of footwear for men, women and children under the Crocs brand" [*id.* at ¶ 113(a)].  Plaintiffs allege that this statement is false and misleading and omitted to state the material facts based on the following:  inventory was rapidly increasing, requiring a substantial write-down to reflect its value accurately; Crocs was losing revenue due to its inability to deliver product as ordered; large orders were routinely

returned for non-compliance; and distribution problems in Rotterdam were resulting in a large loss of sales [*id.* at ¶ 113(a)(i - iv)].

The 2006 10-K also included the following statement: "We have substantially increased the depth and breadth of our distribution and currently sell our products in over 11,000 domestic store locations and in over 80 countries worldwide." [*id.* at ¶ 113(b)].  Plaintiffs allege that this statement is false and misleading and omitted to state the material facts based on the following:  Crocs' distribution system relied on archaic, outdated software which was inadequate to service Crocs' business; Crocs had failed to deploy up-to-date inventory management and other systems; Crocs was facing material operations and logistical problems at its Rotterdam distribution center that were negatively affecting Crocs' ability to service its European customers; Crocs was unable to locate, ship or sell material quantities of its inventory and, as a result of this inability, Crocs had bulk-ordered shoes irrespective of sales; and, finally, Crocs lacked internal operational and financial controls or control systems capable of managing its expanded facilities [*id.* at ¶ 113(b)(i - vi)].

Crocs' 2006 10-K additionally provided that "[i]n December 2006, we began operating a warehouse . . . in Aurora, Colorado, which has enabled us to terminate our relationship with Expeditors in January 2007 reducing our reliance on third party distribution facilities . . . We have additional company-operated warehouse and fulfillment operations in Canada, China . . . [and] the Netherlands." [*id.* at ¶ 113(c)]. Plaintiffs allege that these statements are false and misleading and omitted to state the material facts based on the following:  much of the new warehouse space was procured to store excess, unsaleable, over-produced inventory and because Crocs' Rotterdam

distribution center was then experiencing severe delays and other problems in processing orders due to the lack of adequate internal controls and oversight, which allegedly had cost Crocs tens of millions of dollars in lost sales [*id.* at ¶ 113(c)(i - ii)].

According to Crocs' 2006 10-K, Crocs' "in-house manufacturing capabilities enable us to rapidly make changes to production, providing us with the flexibility to quickly respond to orders for high-demand models and colors throughout the year . . . this production strategy will enable us to continue to minimize our production costs and increase overall operating efficiencies." [*id.* at ¶ 113(d)]. Plaintiffs allege that these statements were false and misleading and omitted to state material facts because Crocs' Chinese supplier, Futai, responsible for more than half of Crocs' footwear production, was manufacturing large quantities of counterfeit copies of Crocs products; Crocs had directed Futai to produce Crocs footwear around-the-clock; Futai also produced product of poor quality or otherwise not to specifications, resulting in large returns by customers; and Crocs chose to purchase the Futai facility but keep it off the books [*id.*].

At page F-2 of the 2006 10-K, Crocs provided a year-end balance sheet for 2006, which included a listing for "Assets, Inventories" of $86,210,000; and a further breakdown of inventory values as $78,938,000 for finished goods, $445,000 for work-in-progress, and $6,827,000 for raw materials [*id.* at ¶ 113(j)]. Plaintiffs allege that this inventory valuation was materially false and misleading and omitted to state material facts because of the alleged facts that the bulk of Crocs' inventory was unsuitable or unsaleable product; Crocs had no basis to report inventory accurately; and Crocs had

failed to take required and necessary write-downs and write-offs in accordance with Crocs' stated policy and Generally Accepted Accounting Principles ("GAAP") [*id.*].

### B.   Press Release Regarding the First Quarter of 2007

On May 3, 2007, Crocs issued a press release with its results for the first quarter of 2007 ("1Q07 press release").  The 1Q07 press release was filed as an appendix to Crocs' Form 8-K for the first quarter of 2007 and incorporated a balance sheet which included a valuation of Crocs' inventories at $94,432,000 as of March 31, 2007 [*id.* at ¶ 117(b)].  Plaintiffs allege that this valuation was materially false and misleading and omitted to state material facts because Crocs' inventory consisted in large part of unsuitable or unsaleable shoes; Crocs had failed to deploy appropriate inventory management systems; Crocs was unable to locate, ship or sell material quantities of product; and a large portion of Crocs' stated inventory was subject to write-downs and write-offs [*id.* at ¶ 117(b)(i - iv)].

### C.   SEC Form 10-Q for the First Quarter of 2007

On May 15, 2007, Crocs filed its SEC Form 10-Q for the first quarter of 2007 ("Crocs' 1Q07 10-Q") [*id.* at ¶ 118].  Crocs' 1Q07 10-Q, which was signed by Case, included the following statements:  "The accompanying condensed consolidated financial statements of Crocs . . . have been prepared in accordance with [U.S. GAAP] . . . [and] in the opinion of management, all adjustments considered necessary for a fair presentation have been included and are of a normal recurring nature" [*id.*].  Plaintiffs allege that these statements were false and misleading and omitted to state material facts because Crocs had not implemented appropriate, up-to-date sales tracking and

forecasting systems across the company; hence, it could not state with any accuracy what it had sold or would be selling; Crocs had failed to ensure that its internal financial controls produced financial statements that were in accordance with U.S. GAAP; and Crocs had failed to ensure that its financial statements were fairly presented by representing that the balance sheets were produced in accordance with GAAP [*id.*].

Crocs' 1Q07 10-Q also listed values of inventories by major classifications as $83,369,000 for finished goods, $742,000 for work-in-progress and $10,321,000 for raw materials [*id.* at ¶ 118(b)].  Plaintiffs allege that these statements were false and misleading and omitted to state material facts because the bulk of Crocs' inventory of finished goods consisted of unsaleable or unsuitable shoes; Crocs had failed to implement up-to-date inventory management systems throughout the company; hence, it was unable to locate, ship or sell material quantities of its inventory; and Crocs bulk-ordered shoes irrespective of customers' orders [*id.* at ¶ 118(c)].

Crocs' 1Q07 10-Q provided that "[o]n February 1, 2007, we implemented a new accounting and operational software package for European and Mexican operations" [*id.* at ¶ 118(e)].  In a certificate appended to the 1Q07 10-Q, Snyder certified that he reviewed the quarterly report; that it did not contain any untrue statement of material fact or omit to state any material fact; and that he had disclosed "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect [Crocs'] ability to record, process, summarize and report financial information" [*id.*].  Case made an identical certification, also appended to the 1Q07 10-Q [*id.*].  Both Snyder and Case

certified that the "information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company for the period covered by this report" [*id.*].  Plaintiffs allege that these statements were false and misleading and omitted to state material facts for, essentially, all of the reasons identified above.

### D.   Press Release Regarding the Second Quarter of 2007

On July 26, 2007, Crocs issued a press release with its results for the second quarter of 2007 ("2Q07 press release") [*id.* at ¶ 120].  The 2Q07 press release was filed as an appendix to Crocs' Form 8-K for the second quarter of 2007 and provided that "our overseas markets - in particular Europe - remained very strong[,] driven by a broader merchandise assortment, increased distribution, and additional shelf space within our existing retailers" [*id.*].  Plaintiffs allege that this statement is false and misleading and omitted to state material facts because Crocs' European distribution system, based in Rotterdam, was experiencing multiple problems and was capable only of delivering a fraction of the product that Crocs sought to move in Europe  [*id.*].  The 2Q07 press release, like the 1Q07 press release, incorporated a balance sheet with a valuation of assets and inventories [*id.*].  Plaintiffs allege that the values represented in this balance sheet were materially false and misleading for the previously-mentioned reasons regarding inappropriate inventory valuation in the 1Q07 press release, *supra* Section III.B [*id.*].[1]

---

[1]These previously-mentioned reasons, or factual allegations, also were discussed as support for the contention that the inventory valuations in the 1Q07 10-Q were false and misleading and omitted to state material facts, *supra* Section III.C.

### E.   SEC Form 10-Q for the Second Quarter of 2007

On August 14, 2007, Crocs filed its SEC Form 10-Q for the second quarter of 2007 ("2Q07 10-Q")  [*id.* at ¶ 122].  Case signed Crocs' 2Q07 10-Q  [*id.*].  The 2Q07 10-Q included the statement that "[t]he accompanying condensed consolidated financial statements . . . have been prepared in accordance with [U.S. GAAP] for interim financial information and with the rules and regulations for reporting on Form 10-Q" [*id.*].  Plaintiffs allege that these statements were false and misleading and omitted to state material facts for the same reasons referred to in regard to Crocs' first quarter 10-Q for 2007, *supra*, Section III.C.  Plaintiffs also allege that Crocs' 2Q07 10-Q contained inventory valuations which were materially false and misleading and omitted to state material facts for the same previously-discussed reasons regarding inappropriate inventory valuation in Crocs' 1Q07 press release, *supra* Section III.B, in Crocs' 1Q07 10-Q, *supra* Section III.C, and in Crocs' 2Q07 press release, *supra* Section III.D [*id.*].

Crocs stated in its 2Q07 10-Q that "[w]e have also improved efficiencies in managing inventory requirements and improved leverage of fixed operating costs due to higher volume" [*id.* at ¶ 122(c)].  Plaintiffs allege that this statement was false and misleading and omitted material facts for the same reasons identified above in regard to inventory valuation in the 1Q07 10-Q, *supra*, Section III.C.  [*id.* at ¶ 122(d)].

Snyder and Case each made identical certifications regarding the 2Q07 10-Q as they made with respect to the 1Q07 10-Q, *supra* Section III.C [*id.* at ¶ 122(e)].  Plaintiffs allege that the statements in the certifications were false and misleading and omitted to

state material facts for similar reasons as previously discussed with respect to the 1Q07 10-Q, *supra* Section III.C [*id.* at ¶ 122(e)(i - viii)].

### F.   Statements by CEO Snyder at the End of the Second Quarter of 2007

At the end of the second quarter of 2007, CEO Snyder stated that "we have continued to invest in our global operating platform, including key personnel and production capacity" [*id.* at ¶ 124].  Crocs then increased its earnings guidance for the third quarter of 2007 and fiscal year 2007 as a whole [*id.*].  Allegedly in response to the increased guidance on earnings, Crocs' stock price increased by almost 10% [*id.*].  On September 27, 2007, Snyder stated at a Piper Jaffray Annual London Consumer Conference that "[o]ver the past, I guess, two years, we have built some very sophisticated global infrastructure . . . So, we are creating a very sophisticated global infrastructure of sales, marketing, accounting, logistics, warehousing in all those markets" [*id.* at ¶ 126].  Plaintiffs allege that these statements were false and misleading because Crocs' global infrastructure had serious problems, preventing Crocs from performing basic sales, marketing, accounting, logistics or warehousing tasks; and because Crocs had not implemented any new software to increase the sophistication of its data management system [*id.*].

### G.   Press Release Regarding the Third Quarter of 2007

On October 31, 2007, Crocs issued a press release with its results for the third quarter of 2007 ("3Q07 press release") [*id.* at ¶ 128].  The 3Q07 press release was filed as an appendix to Crocs' Form 8-K for the 3Q07.  According to this press release, Crocs has "executed several important initiatives that have strengthened our operating

platform, namely the opening of a new 320,000 square foot European distribution facility that will allow us to better support our future growth in the region" [*id.* at ¶ 128(a)].  It also included the statement that "[e]ven as we achieve record results and reach important objectives in our financial, strategic, and operational development[,] we are confident that we are positioned well for continued growth in 2008" [*id.*].  Plaintiffs allege that these statements were false and misleading and omitted to state material facts because Crocs and the Individual Defendants did not include that Crocs had an enormous amount of excess inventory which was overvalued; that Crocs was facing severe problems with its offshore manufacturer; and that Crocs' Rotterdam distribution facility was incapable of distributing product based on demand, resulting in lost sales in Europe [*id.*].  Like the 1Q07 and 2Q07 press releases, the 3Q07 press release incorporated a balance sheet containing valuations of inventories [*id.*].  Also, like the 1Q07 and 2Q07 press releases, plaintiffs allege that the inventory valuations in the 3Q07 press release were false and misleading and omitted to state material facts for the aforementioned reasons regarding inappropriate inventory valuation in the 1Q07 press release, *supra* Section III.B [*id.* at ¶ 128(b)(i - v)].

### H.   October 2007 Crocs Conference Call

On October 31, 2007 Case, McCarvel and Snyder spoke as part of Crocs' third quarter 2007 earnings conference call [*id.* at ¶ 129].  During this call, Snyder stated that "during the third quarter, we opened a new much larger distribution facility in Europe, increased production capacity, [and] upgraded world wide IT systems" [*id.* at ¶ 129(a)(1)].  Regarding inventory, Snyder stated that "[w]e very consciously have been

aggressive in building inventory because we just haven't been able to catch the wave of demand for our product . . . So, we consciously built our inventory up . . . [of] high margin products.  It is very high velocity product that we have got . . . [A] majority of [the inventory] is in the high velocity classics and some of the other high velocity models that we have" [*id.* at ¶ 129(a)(4 - 5)].  Snyder disclosed that Crocs' U.S. inventory had grown by about ten percent [*id.* at ¶ 129(a)(6)].  Given the alleged facts regarding Crocs' use of outdated Excel spreadsheets, the buildup of unsaleable and unsuitable product, and the reasons behind the inventory buildup already discussed, plaintiffs allege that these statements were false [*id.* at ¶ 129(d - f)].

When an analyst questioned the rationale behind the buildup of inventory, Snyder continued to assert that it was a strategic decision by management, stating that Crocs had "decided that with our higher margin product we will just put more on the shelves" [*id.* at ¶ 129(c), (e)].  According to the Complaint, Snyder falsely stated that any problems with Crocs' infrastructure had been resolved and Crocs would be stronger going forward [*id.* at ¶ 129(e)].

**I.   SEC Form 10-Q for the Third Quarter of 2007**

On November 17, 2007, Crocs filed its SEC Form 10-Q for the third quarter of 2007 ("3Q07 10-Q") [*id.* at ¶ 137].  Crocs' then-CFO Case signed the 3Q07 10-Q, stating that it had been prepared in accordance with GAAP and that "[i]n the opinion of management, all adjustments considered necessary for a fair presentation have been included" [*id.* at ¶ 137(a)].  The 3Q07 10-Q also included inventory valuations by major classifications.  Plaintiffs allege that these statements in Crocs' 3Q07 10-Q are false

and misleading and omitted to state material facts for the previously-mentioned reasons regarding inappropriate inventory valuation in the 1Q07 10-Q, *supra* Section III.C [*id.* at ¶ 137(a) and (b)].

Crocs' 3Q07 10-Q included the statement that its "company-operated manufacturing facilities have allowed us to maintain a relatively low cost structure while enabling us to achieve significant production flexibility and decrease lead times to our respective markets" [*id.* at ¶ 137(c)].  Given the aforementioned allegations regarding inventory valuation, *see, e.g., supra* Section III.C, the alleged need to air ship product to meet deadlines, and the alleged counterfeiting by Crocs' Chinese manufacturer, plaintiffs allege that this statement in the 3Q07 10-Q is false and misleading and omitted to state material facts [*id.*].

Snyder and Case each made identical certifications regarding the 3Q07 10-Q as they did for the 1Q07 10-Q and the 2Q07 10-Q, *see supra* Section III.C, E [*id.* at ¶ 137(d)].  The 3Q07 10-Q included the statement that "[i]n August and September 2007, we implemented a new accounting and operational software package at our subsidiaries in Canada and Japan" [*id.*].  Plaintiffs allege that this statement and the certifications by Case and Snyder were false and misleading and omitted to state material facts due to the alleged inventory valuation problems described previously, *see supra* Section III.B; and because Crocs relied on outdated, inappropriate software; could not deliver product that had been ordered by clients; and lacked written procedures and an operations manual [*id.*].

### J.   Press Release Regarding the Fourth Quarter of 2007

On February 19, 2008, Crocs issued a press release with its results for the fourth quarter of 2007 ("4Q07 press release") [*id.* at ¶ 146].  The 4Q07 press release was filed as an appendix to Crocs' Form 8-K for the 4Q07 and included the statement that "our inventories are on plan and we believe we are well positioned to achieve our short and long-term growth objectives" [*id.* at ¶ 146(a)].  Plaintiffs allege that this statement is false and misleading and omitted to state material facts due to the inventory valuation problems described previously, *supra* Section III.B; and because Crocs relied on outdated, inappropriate software; could not deliver product that had been ordered by clients; lacked written procedures and an operations manual; and Crocs' inventory of unsaleable or unsuitable shoes was increasing rapidly [*id.*].

### K.   Crocs' Form 10-K for the Year Ending December 31, 2007

On February 29, 2008, Crocs filed its Form 10-K for the year ending December 31, 2007 ("2007 10-K") [*id.* at ¶ 150].  The 2007 10-K, which was signed by Snyder, Hammer, Marks and Croghan, includes many statements that are similar or identical to the statements in Crocs' 2006 10-K, such as that Crocs was rapidly growing; that Crocs' significant growth was driven largely by the shoes' popularity and Crocs' "ability to significantly expand the breadth and depth of [Crocs'] distribution network"; statements regarding the sufficiency of Crocs' warehouse and distribution capabilities and its warehouse management system; statements regarding Crocs' manufacturing; that Crocs "actively combat[ed] counterfeiting"; and statements regarding inventory valuation as reported in the year-end balance sheet [*id.* at ¶ 150(a) - (f), (i)], *supra*

Section III.A.  Plaintiffs allege that these statements are materially false and misleading and omitted material facts for the reasons discussed previously [*id.* at ¶ 150(a) - (f), (i)], *supra* Section III.A.

In addition, the 2007 10-K includes the statement that "[w]e have experienced rapid growth . . . and as a result have made substantial investments in our inventory" [*id.* at ¶ 150(g)].  Because of the previously-discussed factual allegations regarding Crocs' problems with its inventory management and control systems, such as its use of Excel spreadsheets to track inventory; regarding the unsuitable product which made up the majority of the inventory; and regarding the deceptive devices utilized to keep significant amount of product out of the inventory count, plaintiffs allege that this statement regarding the reasoning behind the inventory buildup is false and misleading and omitted material facts [*id.*].  For similar reasons, plaintiffs also allege that the following statements in Crocs' 2007 10-K are false and misleading and omitted material facts:  "During the quarter ended December 31, 2007, we increased our inventory positions in order to meet anticipated demand for the six months ending June 30, 2008 . . . [and] [w]e expect that new product introductions, limitations on production capacities and seasonal variations may cause our inventory to increase or decrease materially in the future" [*id.* at ¶ 150(h)].

Snyder executed a certification dated February 29, 2008 regarding the 2007 10-K [*id.* at ¶ 152].  This certification was similar to the certification Snyder executed in support of Crocs' 1Q07 10-Q, *supra* Section III.C, and provided that Snyder had reviewed Crocs' 2007 10-K and that it did not contain any untrue statement of a

material fact or omit to state a material fact [*id.*].  Snyder also certified that the financial statements in Crocs' 2007 10-K fairly presented Crocs' financial condition and results of operations and cash flows in all material respects [*id.*].  Plaintiffs allege that Snyder's statements in the 2007 10-K certification are false and misleading and omitted to state material facts for the same factual reasons alleged regarding the certification in support of Crocs' 1Q07 10-Q and for the additional reason of the alleged instruction to keep product on trucks to avoid an accurate inventory count [*id.* at ¶ 152(d)(i)-(viii)].

### L.   Press Release Regarding the First Quarter of 2008

On April 14, 2008, Crocs issued a press release with its results for the first quarter of 2008 ("1Q08 press release") [*id.* at ¶ 154].  The 1Q08 press release, which was filed as an appendix to Crocs' Form 8-K for the first quarter of 2008, included the statement that "given our current inventory position, coupled with our demand driven manufacturing model, we believe we are well positioned to meet any potential upside that materializes during our peak summer season" [*id.* at ¶ 154(a)].  Plaintiffs allege that statement is false and misleading and omitted to state material facts because of the factual allegations regarding inappropriate software and inventory management systems discussed previously, *supra* Section III.B, as well as because Crocs allegedly was not utilizing a "demand-driven manufacturing model," but was increasing manufacturing to stop its Chinese manufacturer from producing knockoffs for the black market [*id.* at ¶ 154(a)(i)-(viii)].

### M.   SEC Form 10-Q for the First Quarter of 2008

On May 12, 2008, Crocs filed its SEC Form 10-Q for the first quarter of 2008

("1Q08 10-Q") [*id.* at ¶ 159].  Crocs' 1Q08 10-Q was signed by Hammer [*id.*].  Crocs'

1Q08 10-Q included a statement that the financial statements were prepared in

accordance with U.S. GAAP, which was allegedly false and misleading and omitted

material facts due to the allegations regarding excessive unsuitable product [*id.* at

¶ 159(a)].  Plaintiffs also claim that the valuation of inventories by major classification

listed in Crocs' 1Q08 10-Q and the statements that Crocs "continued to increase our

inventory positions in order to meet anticipated demand for the quarter ending June 30,

2008 . . . [and] [w]e believe that our inventory levels will decrease over the remaining

quarters of 2008 due to projected sales for the remainder of the fiscal year," were false

and misleading and omitted material facts [*id.* at ¶ 160, 161].

### N.   Allegations of False Certifications by Deloitte & Touche, LLP

Deloitte & Touche, LLP ("Deloitte") provided unqualified Independent Auditor's

Reports, which were included in Crocs' 2006 and 2007 10-Ks [*id.* at ¶ 20]. These audit

opinions stated that Crocs' financial statements were presented in conformity with

GAAP and that Deloitte's audit was performed in accordance with Generally Accepted

Auditing Standards ("GAAS") [*id.* at ¶¶ 199-200].  Plaintiffs allege that these statements

were false and misleading and omitted material facts because Crocs' 2006 and 2007

10-Ks were not presented in conformity with GAAP [*id.* at ¶¶ 176-185, 195, 197].  The

alleged GAAP violations by Crocs include the failure to reflect the risk in a timely

fashion of excess or obsolete inventory through reserves or charges against income, as

required by GAAP and Crocs' disclosed policies [*id.*; *id.* at ¶ 201].  The audit opinion for the 2006 10-K stated that "we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatements" and that "[i]n our opinion, [Crocs'] consolidated financial statements present fairly, in all material respects, the financial position of Crocs, Inc. . . . and the results of their operations and their cash flows . . . in conformity with [U.S. GAAP]." [*id.* at ¶ 199].

According to the Complaint, Deloitte knew or recklessly disregarded many adverse facts concerning Crocs' improper financial reporting during the Class Period. Deloitte allegedly knew of these adverse facts due to the nature of the services provided to Crocs; the fact that Deloitte's personnel were regularly present at Crocs; and due to the fact that Deloitte had intimate knowledge of Crocs' financial reporting practices based on its access to confidential internal corporate, financial, operating and business information [*id.* at ¶ 196].  According to the Complaint, Deloitte failed to exercise professional skepticism when performing audit procedures, and numerous "red flags" should have prompted Deloitte to procure additional "evidential matter."  [*id.* at ¶¶ 204, 208].  For example, according to plaintiffs, Deloitte knew of the risks related to using Excel spreadsheets to account for inventory; knew or recklessly disregarded the fact that Crocs did not have formal written operating procedures or accounting processes to properly account for or control inventory, that Crocs' internal system showing the location, number or destination of inventory was almost always incorrect, that Crocs failed to update its management systems as it grew, that Crocs' cost

accounting, reporting and internal control systems were outdated and inadequate, and that Crocs was experiencing material increases in returns [*id.* at ¶¶ 205-208].

Plaintiffs also allege that Deloitte violated GAAS by failing adequately to plan its audit, supervise the work of assistants, and establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities affecting financial statements, as well as by allegedly failing to study properly Crocs' existing internal controls [*id.* at ¶¶ 214-15].   According to the Complaint, Deloitte reviewed and approved Crocs' quarterly 10-Qs and press releases [*id.* at ¶ 217].

## IV.  ANALYSIS

### A.  General Pleading Standard Under Rule 8

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957), *overruled on other grounds by Twombly*, 550 U.S. at 561-63).   In order to survive a Rule 12(b)(6) motion to dismiss, a complaint "does not need detailed factual allegations [but] . . . [f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555 (citations omitted).   When presented with a motion to dismiss, the Court will assume for the purposes of the motion that all properly-pled allegations within the complaint are true. *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1533 (10th Cir. 1992).   A plaintiff's claim for relief, assuming all factual allegations as true, must "'state a claim to relief that is plausible on its face.'" *Robbins v. Okla. ex rel. Dep't*

*of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at

570).  Determining whether or not a claim for relief is plausible is "'a context-specific

task that requires the reviewing court to draw on its judicial experience and common

sense.'"  *Phillips v. Bell*, 365 F. App'x 133, 139 (10th Cir. 2010) (quoting *Ashcroft v.

Iqbal*, 129 S. Ct. 1937, 1950 (2009)); *see also Robbins*, 519 F.3d at 1247-48 ("the

degree of specificity necessary to establish plausibility and fair notice, and therefore the

need to include sufficient factual allegations, depends on context").

### B.  Pleading Standard Under the Private Securities Litigation Reform Act

Under Section 10(b) of the Securities Exchange Act, it is unlawful for any person

"[t]o use or employ, in connection with the purchase or sale of any security . . . any

manipulative or deceptive device or contrivance in contravention of such rules and

regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b).  SEC Rule 10b-5 provides

that it is unlawful for any person

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to
> state a material fact necessary in order to make the statements
> made, in the light of the circumstances under which they were made,
> not misleading, or
> (c) To engage in any act, practice, or course of business which
> operates or would operate as a fraud or deceit upon any person,
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  In order to state a claim under Section 10(b) and Rule 10b-5, a

plaintiff must allege that a defendant (1) in connection with the purchase or sale of a

security, (2) "made an untrue statement of material fact, or failed to state a material

fact," (3) with scienter; and (4) "that plaintiff relied on the misrepresentation, and

sustained damages as a proximate result of the misrepresentation."  *Anixter v. Home-*

*Stake Prod. Co.*, 77 F.3d 1215, 1225 (10th Cir. 1996) (citing *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 986 (10th Cir. 1992)).  A representation or omission is only material "'if a reasonable investor would consider it important in determining whether to buy or sell stock,' and if it would have 'significantly altered the total mix of information available' to current and potential investors."  *City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1265 (10th Cir. 2001) (quoting *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1119 (10th Cir. 1997)).

In 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA") in order to stem abuses in private securities fraud suits, *Fleming Companies,* 264 F.3d at 1258-59 (citing H.R. Rep. No. 104-369, at 31 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730); *see also* 15 U.S.C. § 78u-4, and "to discourage frivolous litigation." H.R. Conf. Rep. No. 104-369, at 26.  In addition, it was meant to "protect[] outside directors, and others who may be sued for non-knowing securities law violations, from liability for damage actually caused by others." *Id.*  The Conference Committee recognized "the need to reduce significantly the filing of meritless securities lawsuits without hindering the ability of victims of fraud to pursue legitimate claims."  *Id.* at 33.  In order to meet this need, Congress sought to establish a "[h]eightened pleading standard." *Id.* at 35.

The PSLRA amended the Securities Act of 1933 and the Securities Exchange Act of 1934 and imposed specific and more stringent pleading requirements on complaints alleging securities fraud under Section 10(b).  *See id.; Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003).  The PSLRA provides:

(b) Requirements for securities fraud actions
　　(1) Misleading statements and omissions. In any private action arising under this chapter in which the plaintiff alleges that the defendant–
　　　　(A) made an untrue statement of a material fact; or
　　　　(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
　　the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
　　(2) Required state of mind. . . . In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(1) and (2) (1995).  In order to satisfy the pleading requirement of the PSLRA, plaintiffs must "specify each statement alleged to have been misleading," why the statement is misleading and, regarding each act or omission, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *See id.*

When a complaint contains allegations made on "information and belief," the PSLRA requires that "the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C.  § 78u-4(b)(1).  Moreover, allegations based upon "investigation of counsel" are treated as if made on "information and belief."  *Adams*, 340 F.3d at 1098.  Therefore, when a complaint contains allegations based on investigation of counsel, *see* Complaint, ¶ 2, the PSLRA "requires a plaintiff to identify in the complaint specific facts that support the allegations about the misleading nature

29

of the defendant's statements.  Generalized or conclusory allegations of fraud will not be sufficient." *Id.* at 1098.

The Tenth Circuit concluded that this provision of the PSLRA does not require plaintiffs to include "all" facts on which their beliefs concerning false or misleading statements are based, as this "would produce absurd results that Congress could not have intended." *Id.* at 1098-99 (quoting *Novak v. Kasaks*, 216 F.3d 300, 313-14, 314 n.1 (2d Cir. 2000) (other citations omitted)).  Instead, the Tenth Circuit adopted the approach of "evaluating the facts alleged in a complaint to determine whether, taken as a whole, they support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading."  *Adams*, 340 F.3d at 1099 (citing with approval *Novak*, 216 F.3d at 313-314, 314 n.1).  This approach involves an evaluation of the following factors (which will be referred to herein as the "*Adams* factors"):

> (1) the level of detail provided by the facts stated in a complaint; (2) the number of facts provided; (3) the coherence and plausibility of the facts when considered together; (4) whether the source of the plaintiff's knowledge about a stated fact is disclosed; (5) the reliability of the sources from which the facts were obtained; and (6) any other indicia of how strongly the facts support the conclusion that a reasonable person would believe that the defendant's statements were misleading.

*Adams*, 340 F.3d at 1099 (citing *In re Cabletron Sys., Inc.*, 311 F.3d 11, 29-30 (1st Cir. 2002)).  If an analysis of these factors leads to the conclusion that a reasonable person would find the defendant's statements to be false or misleading, "the plaintiff has sufficiently pled with particularity facts supporting his belief in the misleading nature of the defendant's statements."  *Adams*, 340 F.3d at 1099.  Although whether or not the source of the plaintiff's knowledge is disclosed "can significantly strengthen the[]

pleading," a plaintiff's complaint need not "always identify the source, either personal or documentary, of the facts alleged." *Adams*, 340 F.3d at 1101, 1102.

The PSLRA requires that plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). According to the Supreme Court, "courts must consider the complaint in its entirety . . . [in order to determine] whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter.*" Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322-23 (2007) (citations omitted).

"The term 'scienter' has been defined by the Supreme Court of the United States as 'a mental state embracing intent to deceive, manipulate, or defraud." *Fleming Companies*, 264 F.3d at 1258 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). Analyzing the text of the statute, the Supreme Court concluded that "[t]he words 'manipulative or deceptive' used in conjunction with 'device or contrivance' strongly suggest that § 10(b) was intended to proscribe knowing or intentional misconduct." *Ernst & Ernst*, 425 U.S. at 197 (citations omitted). The scienter requirement for Section 10(b) also can be satisfied by "[r]ecklessness, defined as 'conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Fleming Companies*, 264 F.3d at 1258 (quoting *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1232 (10th Cir. 1996)).

In order "to establish scienter in a securities fraud case alleging non-disclosure of potentially material facts, the plaintiff must demonstrate: (1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors." *Fleming Companies*, 264 F.3d at 1261. The Tenth Circuit has emphasized that "'it is the *danger of misleading buyers* that must be actually known or so obvious that any reasonable man would be legally bound as knowing.'" *Fleming Companies*, 264 F.3d at 1260-61 (emphasis in original) (quoting with approval *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 946 (7th Cir. 1989)).

In addition, in order to determine whether or not a complaint's scienter allegations give rise to such a strong inference, "a court governed by [§ 78u-4(b)(2)] must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314. In order for the inference of scienter to qualify as strong, it "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id*. at 314, 324.

## C.  Presumption of Reliance

Under circumstances "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery" for Section 10(b) claims. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972). In a case where plaintiffs allege both misrepresentations and material omissions, the court must "analyze the complaint to determine whether the offenses it alleges can be characterized primarily as

omissions or misrepresentations in order to determine whether the *Affiliated Ute* presumption should apply." *Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000).

Because the Complaint contains allegations of misrepresentations as well as material omissions, the Court must determine whether the allegations in the Complaint "can be characterized primarily as omissions or misrepresentations in order to determine whether the *Affiliated Ute* presumption [of reliance] should apply." *Joseph*, 223 F.3d at 1162.

In Section III, the Court has noted many of plaintiffs' alleged misrepresentations and material omissions.  The affirmative statements in the Complaint identified as misrepresentations tend to be general statements regarding the functioning of Crocs, while the reasons provided as to why these statements are alleged to be false and misleading and omitted material facts tend to be very specific.  For example, the statement that "[w]e have substantially increased the depth and breadth of our distribution" is alleged to be false and misleading because it omitted material information regarding the reliance of Crocs' distribution system on outdated software; Crocs' failure to deploy appropriate inventory management and other systems; Crocs' material operational and logistical problems at Crocs' Rotterdam distribution center; Crocs' inability to locate, ship or sell material quantities of its inventory; and Crocs' bulk-ordering of shoes irrespective of sales, *supra* Section III.A.  Such supporting facts often are themselves supported by additional factual allegations of omitted material information (*e.g.* descriptions of the outdated software and the resultant problems; specific descriptions of the alleged problems at Crocs' Rotterdam distribution center;

and descriptions of specific errors in inventory management, among other factual allegations).

While plaintiffs allege that certain specific statements are false and misleading, they allege a greater amount of material information was omitted. Based on this fact and the Court's review of all of the alleged falsities, misrepresentations, and material omissions, the Court concludes that the allegations in plaintiffs' Complaint can fairly be characterized as omissions. Therefore, plaintiffs' reliance is presumed. *See Affiliated Ute Citizens*, 406 U.S. at 153; *Stoneridge Inv. Partners, LLC v Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008); *Joseph*, 223 F.3d at 1162.

### D.  Claims Against Individual Defendants (Count One)

#### 1.  Ronald R. Snyder, Crocs' Chief Executive Officer

##### a.  Material Misrepresentations and Omissions

Ronald R. Snyder has served as Crocs' Chief Executive Officer ("CEO"), as well as its President, since January 2005 [Complaint at ¶ 30].[2]  Plaintiffs allege that Snyder made a number of specific false and misleading statements and omissions of material facts [Docket No. 87 at ¶¶ 13, 124, 126, 129] and that he certified documents containing false and misleading statements and omissions of material facts [*id.* at ¶¶ 118, 122, 137, 152].

_____

[2]As the case is before the Court on motions to dismiss pursuant to Fed. R. Civ. P.  12(b)(6), the facts as alleged in the Corrected Consolidated Amended Complaint [Docket No. 87] (the "Complaint") are assumed to be true as to each claim.

Snyder signed the 2006 10-K, dated April 2, 2007.  Although plaintiffs allege that the 2006 10-K made false and misleading statements, *see supra*, Section III.A, the Court finds none of them to be false or misleading.  Statements that Crocs was "rapidly growing," had increased its distribution, had added a warehouse in Aurora, Colorado, and had flexible in-house manufacturing capabilities suggest a company that had been growing rapidly and that was having trouble meeting the demand for its shoes, particularly in Europe and Japan.  For example, in the 2006 10-K Crocs disclosed that "[i]n recent periods, our third party vendors and company-operated warehouse, distribution and fulfillment operations have been unable to entirely satisfy the increased demand for our products. The inability to process and deliver sufficient quantities of our products has prevented us from completely filling in a timely manner orders placed by our customers."  Crocs' Mot. to Dismiss, Friedman Declar., Ex. A at 14.[3]  Crocs was trying to solve this problem by stepping up production, by using third-party manufacturers, and by adding warehouse space and distribution networks.  *See* Complaint, ¶ 113.  In the 2006 10-K, Crocs acknowledged that the company's expansion was straining its infrastructure:  "The expansion of the scope and nature of our business . . . and in the number of facilities we use for manufacturing, distribution, and corporate operations, have placed and will continue to place a significant strain on our management and our information systems and resources."  Crocs' Mot. to Dismiss, Friedman Declar., Ex. A at 11.  The Complaint does not suggest that Crocs was, in fact, not taking the steps it said it was taking to meet demand.  Rather, the Complaint

---

[3] The Court has taken judicial notice of certain publicly-filed Crocs documents such as the 2006 10-K.  *See* Docket No. 135.

suggests that Crocs was not doing these things well and should have disclosed more fully its difficulties.  However, because Snyder did not make any statements that were false or misleading, the Court also finds that Snyder had no duty to disclose the various facts that plaintiffs identify as omissions to the 2006 10-K.  *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997) ("Novell had no duty to disclose the information allegedly omitted, because Novell did not make any materially misleading statements that would give rise to such a duty.").

Similarly, the Court finds nothing false or misleading in the press release issued on May 3, 2007.  Plaintiffs focus on the balance sheet, which included a valuation of Crocs' inventory as of March 31, 2007, Complaint ¶ 117(b), but fail to provide specific allegations why such valuation was inaccurate at the time or was based on inappropriate financial accounting standards.  As discussed in greater detail in the section regarding Snyder's scienter, there are too many subjective judgments regarding inventory valuation to consider Crocs' inventory figures false or misleading.

Snyder signed certifications appended to the 1Q07 10-Q, filed on May 15, 2007, that the information contained in the 1Q07 10-Q was accurate and did not omit any material facts [*id.* at ¶ 118(e)].  Plaintiffs claim that such certifications omitted information about the problems Crocs was experiencing with its inventory and accounting and therefore that such certifications were false and misleading.  However, for the same reasons discussed above, the Court does not find that any statement in the 1Q07 10-Q or the certifications appended to it were false or misleading.  Nor does the Court find that Snyder (or Case) omitted material information regarding inventories or internal financial controls.

36

On October 31, 2007, Snyder, Case, and McCarvel conducted a third quarter 2007 earnings conference call [Complaint ¶ 129] with outside financial analysts. Snyder stated that "[w]e very consciously have been aggressive in building inventory because we just haven't been able to catch the wave of demand for our product. . . . So, we consciously built our inventory up . . . [of] high margin products.  It is very high velocity product that we have got." [*id.* at ¶ 129(a)(4-5)].  Snyder also disclosed that U.S. inventory had grown "by about ten percent." [*id.* at ¶ 129(a)(6)].  In reaction to this conference call, investors drove the price of Crocs' stock down 36% the next day [*id.* at ¶¶ 55, 107].  While Crocs may be correct that several factors could have contributed to this price drop, Docket No. 107 at 7, it is fair to infer from the Complaint that the inventory buildup was a key factor.  Plaintiffs have quoted a number of financial analyst reports following the conference call which all mention the inventory buildup (although the analysts did not think that the buildup of excess inventory was unreasonable).  *See* Complaint at ¶¶ 130-136.

Plaintiffs claim that Snyder and Case falsely stated that the inventory buildup was of "classic" and "high-velocity" product [*id.* at ¶ 129(f)], whereas, in reality, "the bulk of the Company's inventory of finished goods consisted of unsalable or unsuitable shoes, such as footwear in colors aimed at women (fuchsia, "butter') but sized 13." [*id.* at § 128(b)(ii)].  The allegation about shoes in these colors first appears in the Complaint at paragraph 79(c), which states that "[a]ccording to CIs #5 and 7, during 2006 and 2007, CROCS had large quantities of shoes manufactured in style/color/size combinations that guaranteed the shoes would never sell, *e.g.*, pallets of size 13 shoes

in fuchsia or a color called "Butter" that was aimed at women."  CI #7, however, did not begin working for Crocs until July 2007 [*id*. at ¶ 60].  Thus, the allegation primarily relies on CI #5, who started in 2006 [*id*.].  Notably, the initial allegation does not say that "the bulk" of Crocs' inventory consisted of unsaleable shoes, but rather "large quantities" were unsaleable, some of which consisted of "pallets" of size 13 shoes in colors preferred by women.  The Complaint does not explain how the "large quantities" of unsaleable shoes become "the bulk" of Crocs' inventory of finished goods [*id*. at ¶ 113(j)(ii)] ("[t]he bulk of the Company's inventory of finished goods consisted of unsalable or unsuitable shoes, such as footwear in colors aimed at women (fuchsia, "butter') but sized 13." [*id*. at 128(b)(ii)].  Plaintiffs nevertheless repeat this allegation throughout the Complaint [*see, e.g., id*. at  ¶¶ 137(b)(i) and (c)(i) ;150(h)(iii)] ("inventory consisted largely of unsalable or unsuitable footwear").  Plaintiffs, however, cannot predicate their allegation regarding the percent of Crocs' inventory that consisted of unsaleable shoes on exaggeration.

The Complaint later alleges that, according to CI #1, who started at Crocs in mid-2007 [*id*. at ¶ 61], a "huge shipment of size 12 pink CROCS shoes was found at a Chinese warehouse, and CI #3 confirmed that 10,000 pairs of unsold size 13 CROCS shoes in a light green color called Sage were found in Aurora, Colorado in September 2007" [*id*. at ¶ 94].  It is not clear what "huge" means in this context and, while 10,000 pairs of unsold shoes is a large number, it must be compared to the 46.9 million pairs of shoes that Crocs sold in 2007.  Crocs' Mot. to Dismiss, Friedman Declar., Ex. I at 34. Reviewing these allegations as a whole, Plaintiffs have failed to plead facts that give

rise to a reasonable inference that Snyder's statements about building up inventory of "high volume" or "high velocity" shoes was false or misleading.  Nothing else in the conference call is false or misleading or something that would give rise to a duty of disclosure.

Snyder signed a Sarbanes-Oxley certification in connection with Crocs' 3Q07 10-Q [*id.* at ¶ 137(d)], which was filed on November 17, 2007 [*id.* at ¶ 137].  Plaintiffs claim that such certification was false and misleading for the same reasons discussed earlier.  Snyder did not sign the 3Q07 10-Q itself; Case did.  The Court finds no basis under the *Adams* factors to consider statements in the 3Q07 10-Q certification or any such Sarbanes-Oxley certification alleged in the Complaint false and misleading.[4]

On February 29, 2008, Crocs filed its Form 10-K for the year ending December 31, 2007 ("2007 10-K").  It was signed by Snyder, Hammer, Marks, and Croghan.  Plaintiffs claim that these defendants made false and misleading statements when they stated that "[w]e have experienced rapid growth in our revenues and earnings over the past three years, and as a result have made substantial investments in our inventory, global infrastructure and property plant and equipment . . . ."  Complaint, ¶ 150(g).  The reasons that plaintiffs claim this statement is misleading are the same reasons reviewed earlier, which the Court rejects for the same reasons.

The 2007 10-K states "[o]ur inventories increased to $248.4 million at December 31, 2007 from $86.2 million as of December 31, 2006.  During the quarter ended

---

[4]The Court also finds that none of the Sarbanes-Oxley certifications are, by themselves, sufficient to create a strong inference of scienter.  *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1004 (9th Cir. 2009).

December 31, 2007, we increased our inventory positions in order to meet anticipated demand for the six months ending June 30, 2008 . . . ." [*id.* at ¶ 150(h)].  In addition to the reasons previously stated for why plaintiffs allege that this information about inventory is false and misleading, plaintiffs claim that Crocs' "inventory level had risen, not . . . 'in order to meet anticipated demand' for the next six months, but because of the complete breakdown of the Company's manufacturing, forecasting, and inventory management and control systems . . . ." [*id.* at ¶ 150(h)(i)].  However, the facts alleged do not allow for a reasonable inference to that effect.  As noted in the October 31, 2007 Crocs' press release, revenues for the quarter ended September 30, 2007 increased 130% compared to the previous year.  *See* Docket No. 107, Ex. F at 1.  Crocs appeared to be growing rapidly and, as discussed earlier, the inventory buildup appears to have been an intentional reaction to Crocs' rapid growth and the issue of unmet demand.  The financial press, after being made aware of the excess inventory, considered such a buildup reasonable.  Complaint, ¶¶ 139-146.  While plaintiffs may believe that the financial analysts' opinions would have been different had Crocs made the disclosures plaintiffs allege as omissions, the commonsense conclusion remains that Crocs responded to the problem of unmet demand by increasing inventory.  Such statements were not misleading.

### b.  Scienter

When the Complaint is considered in its entirety, a reasonable person would infer the following regarding Crocs: from its formation in 2002, Complaint at ¶ 48, to the beginning of the Class Period on April 2, 2007, Crocs was an incredible success story.

Revenue increased from $13.5 million in 2004 to $354.7 million in 2006 [*id.* at ¶ 213].

Revenues continued to rise in 2007.  Revenues for the quarter ended March 31, 2007

increased 217% to $142 million compared to $44.8 million for the first quarter ended

March 31, 2006.  Crocs' Mot. to Dismiss, Friedman Declar., Ex. B at 2.  Revenues for

the quarter ended June 30, 2007 increased 162% to $224.3 million compared to $85.6

million for the quarter ended June 30, 2006 [*id.*, Ex. D at 2].  Revenues for the quarter

ended September 30, 2007 increased 130% over the comparable period a year before

[*id.*], Ex. F at 2.  However, Crocs' rapid growth came with problems.  Crocs was losing

sales, particularly in Europe, because it could not manufacture and distribute a

sufficient number of its most popular shoes to satisfy demand.  Complaint, ¶¶ 79, 93.

Supplying this demand was complicated by Crocs' inadequate methods for keeping

track of its inventory [*id.* at ¶¶ 67, 70, 72].  Crocs also had problems with the Chinese

supplier, Futai, which manufactured over half of Crocs' shoes.  To reduce Futai's

production of "bootleg" shoes, Crocs ordered the factory to produce shoes 24 hours a

day, seven days a week [*id.* at ¶ 85].  Moreover, Crocs' distribution center in Rotterdam

had a variety of problems that caused it to be a bottleneck in Crocs' distribution network

[*id.* at ¶ 90].

As a result of increasing shoe production, of Crocs not knowing what inventory it

had, and of Crocs' distribution problems, Crocs' inventory grew.  During a third quarter

of 2007 conference call with the financial press on October 31, 2007, Snyder stated that

Crocs had been aggressively building up its inventory to meet demand and that its U.S.

inventory had increased by 10%.  Although Crocs then took steps to reduce its

inventory [*id.* at ¶ 109], on April 14, 2008 Crocs disclosed that inventory rose 5-10%

between December 31, 2007 and March 31, 2008 [*id.* at ¶ 112].

When the Complaint is considered in its entirety, the inference that Crocs and

the Individual Defendants acted with scienter is not as compelling as the plausible

opposing inference, which is that Crocs was growing so fast that its size overtook the

sophistication of its management systems, leading to statements in certain financial

filings that were backed by confidence in Crocs' past performance but that were not

fully informed by accumulating logistical problems.  Nothing about this more compelling

and more cogent inference involves Crocs or the Individual Defendants knowingly or

intentionally deceiving, manipulating, or defrauding investors, or doing so recklessly as

defined by *Fleming Companies*, 264 F.3d at 1258.

While the 180-page Complaint is detailed, those details almost exclusively reveal

mismanagement by Crocs, not fraud.  For example, plaintiffs' response to the

defendants' motions to dismiss contains the following list of "Hard Facts About the

Company's Fraud":

- Crocs' fast-rising inventory levels (¶64);

- the fact that inventory numbers were reported daily by email to Crocs' executives (¶65);

- the use of primitive Excel software rather than modern systems to track inventory (¶67-71), causing a wide variety of problems;

- Crocs' lack of written company procedures or an operations manual (¶75);

- the Company's inability to fill customer orders because of its systems breakdowns (¶79);

- the Futai counterfeiting problem and the instruction to produce shoes "24/7," without regard to customer orders (¶¶82-87);

- the breakdown in distribution in Rotterdam, causing lost sales of 1-1.5 million shoes in Europe in 2007 alone (¶¶88-93);

- the overall impact of Crocs' logistics and inventory breakdowns on the Company in the third quarter of 2007, including leasing multiple additional warehouses solely to store unsalable product (¶¶94-106), which culminated in hiding excess inventory on trucks and shipping 400,000 pairs of shoes to Rotterdam to conceal it during a physical count. (¶¶107-112)

Plaintiffs' Resp. at 35-36.  With the possible exception of the last item[5], nothing on this list describes fraudulent conduct.  Instead, it describes mismanagement.  Allegations of corporate mismanagement are not actionable under Rule 10b-5.  *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977); *City of Dearborn Heights v. Waters Corp.*, --- F.3d ----, 2011 WL 167837 (1st Cir. Jan. 20, 2011); *Horizon Asset Mgmt., Inc. v. H&R Block, Inc.*, 580 F.3d 755, 766-767 (8th Cir. 2009) ("A plaintiff must allege more than 'incompetence' or corporate mismanagement before a claim of negligence rises to the level of securities fraud."); *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999).  Nor are allegations of mere negligence actionable.  *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1093 (9th Cir. 2010); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 198-99 (1st Cir. 1999).

---

[5] The allegations about hiding inventory are based on CI #5, who claims that, during the inventory count in December 2007, "CROCS executives ordered trucks filled with unsold shoes to remain in transit during key days when inventory was being counted to conceal the fact of excessive inventory," and CIs #1, #3, and #6, who claim that from December 1 to December 23, 2007, "CROCS also shipped about 400,000 shoes to Rotterdam that were not counted as inventory."  Complaint, ¶ 110(a).  As to CI #5's allegations regarding "Crocs executives," such general allegations are not sufficient to impute knowledge to the Individual Defendants and are not sufficient to establish scienter.  *See Adams*, 340 F.3d at 1107.  As to the allegations of the three CIs regarding shoes not counted in inventory, none of these three CIs were accountants or are alleged to have any basis for knowing whether such shoes were or were not ultimately counted in inventory.

Plaintiffs' allegations regarding defendants' scienter are also not cogent.  While plaintiffs make general allegations that "Crocs' executives" knew about the inventory buildup, which they claim "motivated Defendants to conceal the Company's problems and their causes," Complaint, ¶ 53, plaintiffs' more detailed allegations claim that Crocs' management systems were so poor that Crocs did not know the size or composition of the inventory it had.  *See, e.g.,* Complaint, ¶ 60 ("because the purchasing and planning department did not have accurate enough data on sales, it was continually 'bulk ordering' all styles, colors, and sizes of shoes"); ¶ 71 (Crocs' "internal system showing the location, number, or destination of inventory was almost invariably incorrect"; Crocs' "system would say that there would be a certain amount of a kind of shoe, but there would actually be 10 times the amount the data reported"); ¶ 74 (Crocs' "receiving department continually got its numbers completely wrong"); ¶ 76 ("Defendants knew that they had no reasonable basis for recording data relating to inventory"); ¶ 103 (in August and September 2007, Crocs leased six or seven additional warehouses in Aurora, Colorado which "used a inventory system that was completely different from the system used by the CROCS-owned warehouses" and "created a significant problem for most people in the Company who were trying to understand the Company's increasingly difficult inventory picture").

The fact that the Complaint shows efforts by Crocs to remedy the various problems that it was encountering is also inconsistent with a strong inference of scienter on the part of defendants.  For example, Crocs purchased an enterprise resource planning system to assist in ordering and sales, which was implemented in 2008, Complaint, ¶ 81; created a project management team to evaluate Crocs' inventory

problems, with the plan being to replace the Excel spreadsheets beginning around September 2007 [*id.* at ¶ 105]; and Crocs "finally conducted a physical count of the products in its warehouses that provided an in-depth review of all its inventory" in December 2007 [*id.* at ¶ 110].  Such efforts suggest a motive to remedy problems, not to conceal them.

The most important allegations regarding scienter in the Complaint are the allegations regarding what the Individual Defendants knew about Crocs' inventory during the Class Period and who among the Individual Defendants shared this knowledge.  Plaintiffs allege that Snyder "likely" received daily e-mail reports regarding the inventory buildup in the Colorado warehouses [*id.* at ¶ 65].  Plaintiffs also allege that "Crocs' executives," presumably including Snyder, participated in discussions regarding the lack of accurate data due to the use of Excel spreadsheets [*id.* at ¶ 67], and that the "Individual Defendants" engaged in daily discussions regarding the unreliable inventory counts and the inability to match orders to inventory [*id.* at ¶ 72].  According to the Complaint, the Individual Defendants received information regarding the problems with the distribution center in Rotterdam [*id.* at ¶ 17].

Plaintiffs rely largely on information from confidential informants ("CIs") as the basis for their allegations about what the Individual Defendants knew about Crocs' inventory problems[6].  The fact that the sources are not named is relevant to the

---

[6]The Complaint describes the confidential informants as follows: #1 worked in Crocs' global supply chain management from mid-2007 through mid-2008 and specialized in optimizing supply chain operations; #2 was a logistics coordinator at Crocs during the last three quarters of 2007 and had previously been with the company beginning in late 2006; #3 was a third party logistic coordinator at Crocs from December 2007 to May 2008; #4 was a project manager working on global operations and supply

determination of whether or not the alleged misstatements and omissions were false and misleading and omitted to state material facts, and the Court has considered this factor when making these determinations.  *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 712 (7th Cir. 2008) (noting that named sources would be better, but concluding that "the absence of proper names does not invalidate the drawing of a strong inference from informants' assertions") (citations omitted); *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) ("even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"); *In re Rhythms Secs. Litig.*, 300 F. Supp. 2d 1081, 1087 (D. Colo. 2004) ("While plaintiffs may 'significantly strengthen their pleading' by identifying the sources – documentary or personal – for the facts alleged in their complaint, they are not required to do so in order for those facts to be considered in the sufficiency determination") (quoting *Adams v. Kinder-Morgan*, 340 F.3d at 1102).

Plaintiffs' use of confidential informants to bolster their allegations of scienter falls short.  As exemplified by the list from plaintiffs' response quoted above, most of the CIs' allegations support inferences of mismanagement, not fraud.  The allegations regarding knowledge on the part of the defendants concerning inventory either do not suggest fraud or fail to set forth sufficiently detailed allegations that the Individual

chain development problems from September 2007 to August 2008; #5 was a shipping manager and shift operations manager at Crocs' main U.S. warehouse from 2006 through 2008; #6 managed a Crocs warehouse in Colorado from August 2006 through most of 2008; #7 was a Crocs supply chain manager in a Colorado warehouse starting in July 2007; #8 was a buyer who dealt with Crocs while at Shoes.com and Babystyle [Docket No. 87 at ¶¶ 60-62, 69, 71].

Defendants were aware of the inventory problems.  Some of the allegations in the

Complaint allege that specific defendants were told of inventory problems.  *See, e.g.,*

Complaint, ¶ 60 (Crutchfield); ¶ 62 (McCarvel); and ¶ 65 (Crutchfield and McCarvel).

However, most of the allegations regarding defendants' knowledge of inventory

problems rely on blanket allegations of knowledge by "Crocs executives" or the

"Individual Defendants" with no explanation of why the CIs, especially given their

positions within the company, would have contact with some, and much less all, of the

executives or Individual Defendants.  *See, e.g.* ¶ 66 ("According to CI #6, the CROCS'

executives . . ."); ¶ 67 ("According to CIs #1, 6 and 8, the CROCS' executives . . .");

¶ 72 ("Individual Defendants, based on daily discussions with the warehouse and sales

staffs . . ."); ¶ 100 ("CROCS senior management informed employees that the

Company knew the demand . . . was decreasing . . ."); ¶ 104 ("CI #4 explained that

during the third quarter of 2007, top CROCS management including the Individual

Defendants . . .").  General allegations of this nature are not sufficient to impute

knowledge to the Individual Defendants and are not sufficient to establish scienter.  *See*

*Adams*, 340 F.3d at 1107 ("[c]onclusory allegation about the involvement of 'senior

management' does not amount to a particularized claim that Kinder -- who was a

director not a manager -- knew about the false statements"); *Fleming Companies*, 264

F.3d at 1264 ("Plaintiffs' conclusory allegations both that Defendants Devening and

Twomey 'had actual knowledge . . . or [were] recklessly indifferent to it' . . . are

completely unsupported by any particularized facts that might give rise to a strong

inference they they acted with scienter").

Allegations that Snyder knew of the specific causes of the excess inventory are virtually non-existent.  CI #6, who is alleged to have managed a Crocs warehouse in Colorado from August 2006 through most of 2008, claims that Snyder "likely" knew how fast Crocs inventory levels were rising in Colorado as of August 2006 [Complaint at ¶ 65], which is speculative and, in any event, says nothing about the cause of the buildup. *See Adams*, 340 F. 3d at 1104-05 (allegations based on pure speculation are not entitled to much weight).  The Complaint alleges that Crutchfield had knowledge of the inventory problems and that he "reported regularly" to Snyder, but does not identify what information Crutchfield "regularly reported" to Snyder [*id.* at ¶ 89].  In fact, the Complaint does not claim that Snyder was aware of the specific reasons for the inventory and distribution problems.  The allegations instead support the view that, due to Crocs' outdated inventory management systems, Crocs' senior executives did not know Crocs' own inventory.  *See, e.g.* Complaint, ¶ 113(g)(ii) ("The Company lacked any systems for tracking or valuing properly its inventory and, therefore, could not properly value or estimate its inventory needs or values.").  If Snyder did not know Crocs' own inventory, but yet was taking steps disclosed in the 2006 10-K to satisfy excess demand, it suggests that Crocs made errors in addressing the problems of unmet demand, but not that Snyder was fraudulently misleading investors.

Another tenet of plaintiffs' fraud allegations is that "Defendants issued financial reports that inflated the value of the Company's inventories and, in turn, its net income, profits and assets." [Complaint, ¶ 53, *see generally, id.* ¶¶ 176 - 195].  "A company's management – not the auditor – is responsible for the information contained in its financial statements and the propriety of its underlying accounting policies, including

48

compliance with GAAP." *Dronsejko v. Thornton*, --- F.3d ----, 2011 WL 167245 at *2

(10th Cir. Jan. 20, 2011) (citing *Deephaven Private Placement Trading, Ltd. v. Grant*

*Thornton & Co.*, 454 F.3d 1168, 1174-75 (10th Cir. 2006)).  In particular, plaintiffs claim

that the inventory valuation portion of the balance sheets that were a part of Crocs'

2006 10-K were false and misleading because Crocs "failed to take required and

necessary write downs and write offs of inventory in accordance with CROCS' stated

inventory accounting policy and GAAP" [*id.* ¶ 113(j)(i)].  Plaintiffs make similar claims

about other financial statements [*see id.* ¶ 118(c)(v) [1Q07 10-K]; ¶ 119 [1Q07 10-K];

¶ 146(b) [Feb. 19, 2008 press release]; ¶ 151 [2007 10-K]; ¶ 154(a)(vii) [April 14, 2008

press release]].  After the Class Period, in the third quarter of 2008, Crocs wrote off $70

million of inventory [*id.* at ¶ 184].

In response to these allegations, Crocs argues that plaintiffs fail to cite any

internal documents or witnesses with knowledge of Crocs' accounting to support the

claim that Crocs' inventory was materially misstated.  Crocs' Mot. to Dismiss at 28.

Moreover, Crocs claims that, pursuant to Accounting Research Bulletin 43, any write-

down of excess inventory depends on the company's prediction of future demand at the

time that the financial statements are prepared [*id.*].  Because the Complaint lacks any

allegations regarding Crocs' internal predictions of future demand, Crocs argues that

the November 2008 write-down of inventory cannot support an inference of scienter.

The Court agrees.  In order for plaintiffs to support their allegations regarding scienter in

regard to the 2008 inventory write-down, plaintiffs would have to provide detailed

allegations concerning when Crocs knew that lessened demand would cause the cost

of the inventory to fall below the "net realizable value," i.e. the estimated selling price in the ordinary course of business less reasonably predictable costs of completion and disposal.  *See* Complaint, ¶ 113(g); Deloitte Mot. to Dismiss at 17.  Courts have recognized that decisions about write-downs involve the exercise of subjective judgments that do not lend themselves to allegations of securities fraud.  *See Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 433 (5th Cir. 2002) ("the nature of the accounting problems at Baker Hughes that lead to the restatement, i.e. uncollectible accounts receivable, inventory write downs and unrecorded employee compensation, can easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action"); *In re Ibis Tech. Sec. Litig.,* 422 F. Supp. 2d 294, 314 (D. Mass. 2006) ("plaintiffs cannot plead a GAAP violation merely by claiming that a write-off for obsolete inventory that was taken in one quarter should have been taken in an earlier quarter"); *Morgan v. AXT, Inc.*, No. C 04-4362 MJJ, 2005 WL 2347125 at *14 (N.D. Cal. Sept. 23, 2005) ("AXT's decision to write off $2.1 million for inventory obsolescence after the close of the Class Period does not necessarily read back on what the Company should have done, but did not do, during the Class Period, or on the falsity of the Company's financial statements during that period"); *In Re Oak Tech. Sec. Litig.,* No. 96-20552, 997 WL 448168 at *9 (N.D. Cal. Aug. 1, 1997) ("at the pleading stage, a plaintiff must allege facts sufficient to support a finding that the accounting decision is the result of fraud and not 'merely the difference between two permissible judgments.'" (quoting *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541,1549 (9th Cir. 1994))); *In re PetSmart Sec. Litig.*, 61 F. Supp. 2d 982, 993 (D.

Ariz. 1999) ("The pleading must provide some particularized support regarding inventory levels, the defendants' knowledge, and approximately when plaintiffs think the write-down should have occurred.").  Plaintiffs' allegations, unsupported by any person who worked in Crocs' accounting department, lack the specificity necessary to give rise to an inference of scienter regarding the 2008 write-down in particular or the way Crocs stated its inventory during the Class Period generally.

Plaintiffs argue that the allegations of stock sales during the Class Period by certain defendants is evidence of scienter.  Plaintiffs' Resp. at 45-49.  However, the Complaint does not compare stock sales by these defendants before or after the Class Period.  *See* Complaint, ¶ 220.  As such, the allegations of sales, by themselves, do not create an inference of scienter on the part of these defendants.  *See Zucco Partners*, 552 F.3d at 1005 ("For individual defendants' stock sales to raise an inference of scienter, plaintiffs must provide a 'meaningful trading history' for purposes of comparison to the stock sales within the class period."); *In re Qwest Commc'n Int'l, Inc.*, 396 F. Supp. 2d 1178, 1195 (D. Colo. 2004) ("Courts should not infer fraudulent intent based only on the fact that some officers sold stock.  Rather, plaintiffs must allege that the trades were made at times and in quantities that are suspicious enough to support the necessary strong inference of scienter.").  No such context exists here.

### 2.  *Peter S. Case, Senior Vice President, Retail Division*

#### a.  **Material Misrepresentations and Omissions**

Plaintiffs allege false and misleading statements and omissions of material facts in documents certified by defendant Peter S. Case, as well as false certifications by

Case.  [Docket No. 87 at ¶¶ 118, 122, 137].  Case served as Crocs' Chief Financial Officer ("CFO") and Treasurer from April 2006 until January 2008, as well as serving as the Senior Vice President, Retail Division since January 2008 [*id.* at ¶ 31].  In addition, Case signed Crocs' 2006 10-K, 1Q07 10-Q, 2Q07 10-Q, and 3Q07 10-Q, as CFO.

Plaintiffs allege that the representation in the 1Q07 10-Q and 2Q07 10-Q, Complaint, ¶¶ 118, 122, that the financial statements were prepared according to GAAP [*id.* at ¶ 122(a)], and that "all adjustments considered necessary for a fair presentation" were made [*id.* at ¶ 118(i)], are false and misleading.  However, as explained above, Crocs' statements about GAAP were not false or misleading, and plaintiffs have failed to allege any specific accounting standard Crocs did not follow.  Similarly, none of the inventory valuations in these 10-Q forms are false or misleading.

Plaintiffs complain that Case's statement in the 1Q07 10-Q that Crocs has "achieved significant growth since our inception, driven largely by the popularity of our footwear products and our ability to significantly expand the breadth and depth of our distribution network and manufacturing capacities," Complaint, ¶ 118(d), is false and misleading.  However, there is no question that Crocs started small [*id.* at ¶ 48] (in 2002, Crocs had one product), and by 2006 sold its products in 11,000 domestic retail stores and 8,000 international ones.  *Id*, at ¶ 51.  This type of general, historical statement is not false or misleading.

Plaintiffs claim that Case's statement in the 2Q07 10-Q that "[w]e have also improved efficiencies in managing inventory requirements" [*id.* at ¶ 122(c)], is false and misleading.  This statement is vague about what constitutes "improved efficiencies."

However, in light of the allegations of various problems that Crocs had managing its inventory, and in light of the fact that this statement was made on August 14, 2007, after more inventory problems had developed, the Court finds that the alleged facts support a reasonable belief that this statement was misleading.

Plaintiffs claim that Case's statements regarding GAAP in the third quarter Form 10-Q ("3Q07 10-Q"), filed on November 17, 2007, are false and misleading. Complaint ¶ 137. However, for the same reasons stated above in regard to the 1Q07 10-Q and the 2Q07 10-Q, such statements are not false or misleading. Moreover, the Court does not find any other statement in the 3Q07 10-Q to be false or misleading.

### b. Scienter

For the same reasons discussed above in regard to Snyder, the Court finds that the inference that Case acted with scienter is not as compelling as the plausible opposing inference that Case made the complained of statements out of hopefulness about Crocs' future sales (borne out by many quarters of rising demand) and a lack of appreciation for the cause of Crocs' inventory problems. For example, the facially misleading statement that Crocs had "improved efficiencies in managing inventory requirements" [*id.* at ¶ 122(c)], is immediately followed by the statements that Crocs' gross profit margin improved by 400 basis points in the second quarter of 2007 as compared to the second quarter of 2006 -- and that Crocs had reduced its reliance on third party distribution facilities. Moreover, the Complaint contains no specific allegations regarding Case's knowledge of Crocs' inventory problems, but rather relies merely on general allegations regarding the "individual Defendants" or "Crocs' executives," which fail to support a strong inference of Case's scienter.

53

### 3.   *Russ Hammer, Chief Financial Officer*

Since January 16, 2008, Hammer has been Crocs' Chief Financial Officer.

[Docket No. 87 at ¶ 32].  According to the Complaint, defendant Hammer signed Crocs'

2007 Form 10-K [*id.* at ¶ 150].  Plaintiffs allege that a number of descriptions regarding

Crocs' business operations, such as Crocs having "significantly expanded" its

distribution network, Complaint, ¶ 150(b), and Crocs having a "flexible, globally

diversified, low-cost manufacturing base" [*id.* at  ¶ 150(d)], were false and misleading

for the same reasons identified previously.  However, plaintiffs do not identify any

specific allegations that make these general descriptions of Crocs' business inaccurate

or misleading.

Regarding inventory, Crocs' 2007 10-K stated "[o]ur inventories increased to

$248.4 million at December 31, 2007 from $86.2 million as of December 31, 2006.

During the quarter ended December 31, 2007, we increased our inventory positions in

order to meet anticipated demand for the six months ending June 30, 2008 . . . ."

Complaint, ¶ 150(h).  Plaintiffs claim that Crocs' inventory rose, not to meet anticipated

demand, but because of the breakdown of its inventory management and control

system [*id.*, ¶ 150(h)(i)].  Hammer started a month before he signed the 2007 10-K.

There are no allegations that he was aware of what plaintiffs allege to be the real

reason for the inventory buildup.  Nor do plaintiffs provide a reason to infer that

Hammer was aware of the causes of the inventory buildup, other than there being a

conscious decision on Crocs' part to increase production to meet demand.  For

example, there are no allegations that the project management team formed after the

third quarter 2007 inventory increase had issued a report or any findings by the time of the 2007 10-K.  Complaint, ¶ 105.  Thus, the allegations in the Complaint regarding Hammer do not give rise to a strong inference of scienter.

### 4. John P. McCarvel, Chief Operating Officer and Executive Vice-President

McCarvel served as Crocs' Chief Operating Officer ("COO") as well as its Executive Vice-President since February 2007.  He previously served as Crocs' Senior Vice President for Global Operations.  [Docket No. 87 at ¶ 33].  Plaintiffs do not allege that McCarvel specifically made any statement that is false and misleading or that he omitted to state a material fact.  According to the Complaint, the statements which are allegedly false and misleading and omitted to state material facts from Crocs' SEC filings and press releases can be attributed to McCarvel under the group pleading doctrine.  However, given that the Court has not found any of these documents to contain false or misleading statements or material omissions, the group pleading doctrine, assuming it survived passage of the PSLRA, is insufficient to state a claim in Count One against McCarvel.

### 5. Scott Crutchfield, Senior Vice President for Global Operations and former Vice President for the Global Supply Chain

According to the Complaint, Crutchfield was the Senior Vice President for Global Operations and former Vice President for the Global Supply Chain during 2006 and 2007 [*id.* at ¶¶ 5, 34].  Plaintiffs do not allege that Crutchfield specifically made any statement that is false and misleading or omitted to state a material fact.  According to the Complaint, the statements which are allegedly false and misleading and omitted to

state material facts from Crocs' SEC filings and press releases can be attributed to Crutchfield under the group pleading doctrine.  For the reason stated above in regard to McCarvel, such allegations are insufficient.

### E. Crocs, Inc. (Count One)

Defendants Snyder, Case, and Hammer were executive officers of Crocs whose actions were intended to benefit Crocs.  In addition, the complained of statements in the SEC filings and press releases issued in Crocs' name appear from the Complaint to have been made pursuant to the defendants' positions of authority within the company. Therefore, the particular alleged misrepresentations and omissions in the SEC filings and Crocs' press releases will be treated as having been made by Crocs.  *SEC v. Wolfson*, 539 F.3d 1249, 1251 n.1, 1261 (10th Cir. 2008); *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 365-66 (5th Cir. 2004).

Analyzing the six factors listed in *Adams*, the Court concludes that, assuming all properly pled factual allegations are true, the facts alleged do not support a reasonable belief that the alleged misstatements and omissions in Crocs' 1Q07, 2Q07, 3Q07, 4Q07, and 1Q08 press releases were false and misleading and/or omitted to state material facts.  *See Adams*, 340 F.3d at 1099.  The only exception is the statement that Case made about "increased efficiencies" in the 2Q07 10-Q, which the Court found to be misleading.

Because the Court has already determined that the Complaint fails to allege that Crocs' CEO Snyder, as well as Crocs' CFOs Case and Hammer, had the scienter to

defraud, those allegations are also insufficient to allege scienter to defraud on behalf of Crocs itself.  *Adams,* 340 F.3d at 1106.

### F.   Deloitte & Touche, LLP (Count Three)

The statements of Deloitte that plaintiffs allege to be false and misleading and omitted to state material facts include statements that Crocs' financial statements were prepared in accordance with GAAP; that Crocs' financial statements fairly present the financial position of Crocs; and that Deloitte's audit was performed in accordance with GAAS.  *See, e.g.*, Docket No. 87 at ¶¶ 199-200.

Plaintiffs allege scienter on the part of Deloitte due to the nature of the services Deloitte provided to Crocs, the fact that Deloitte's personnel were regularly present at Crocs, and due to the fact that Deloitte had intimate knowledge of Crocs' financial reporting practices based on its access to confidential internal corporate, financial, operating and business information [*id.* at ¶ 196].  In addition, plaintiffs allege the existence of "'red flags' which should have raised questions in the auditors' minds" [*id.* at ¶ 204].  These general allegations could be charged against any auditor in the context of an audited company's alleged fraudulent financial filings.  "[I]t is well-established that '[c]laims of accounting irregularities or violations of [GAAP] support a claim of scienter only when coupled with evidence that the violations or irregularities are the result of the defendant's fraudulent intent to mislead investors."  *Dronsejko*, 2011 WL 167245 at *9 (quoting *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1191 (10th Cir. 2003)).

Plaintiffs have not alleged any facts tending to show that Deloitte had actual knowledge of the alleged false or omitted facts.  For example, plaintiffs do not allege that any Deloitte employee was present at any specific meeting at which any of this information was disclosed and, similarly, do not allege any specific corporate, financial, operating or business information to which Deloitte had access.  Plaintiffs' own allegations imply that, at most, Deloitte was negligent in disregarding the red flags: the "'red flags' [] *should have* raised questions in the auditors' minds" [*id.* at ¶ 204]. Although Deloitte may have been negligent in not noticing the facts underlying the alleged fraud, the standard for scienter required for liability pursuant to Section 10(b) and Rule 10b-5 is actual knowledge or recklessness.  The Court concludes that plaintiffs have failed to allege sufficiently specific facts or circumstances available to Deloitte that demonstrate Deloitte engaged in highly unreasonable conduct constituting an extreme departure from the standard of ordinary care or disregarded a danger so obvious that any reasonable person would have known of it.  *See PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 693-94 (6th Cir. 2004) ("When the standard of recklessness for an auditor is overlaid with the pleading requirements of the PSLRA, a simple rule emerges: to allege that an independent accountant or auditor acted with scienter, the complaint must allege specific facts showing that the deficiencies in the audit were so severe that they strongly suggest that the auditor must have been aware of the corporation's fraud") (quoting *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 505, 514 (S.D. Ohio 2000)) (other citations omitted).

## V.   CONTROLLING PERSONS UNDER SECTION 20(a) - CROCS AND THE INDIVIDUAL DEFENDANTS (COUNT TWO)

Section 20(a) of the Securities Exchange Act of 1934 provides, in relevant part:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  According to the Tenth Circuit, the first element of a prima facie case pursuant to Section 20(a) is "a primary violation of the securities laws."  *Adams*, 340 F.3d at 1107 (quoting *Fleming Companies*, 264 F.3d at 1270-71) (citing *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998)).  The second element is control over the primary violator.  *Adams*, 340 F.3d at 1108 (quoting *Fleming Companies*, 264 F.3d at 1270-71) (citing *Maher*, 144 F.3d at 1305).

The Court has concluded that plaintiffs have failed to state a Section 10(b) claim against defendants Snyder, Case, Hammer, and Crocs.  Therefore, plaintiffs have failed to satisfy the first element of a prima facie case under Section 20(a) as against persons alleged to be controlling persons of these defendants.[7]  *See Maher*, 144 F.3d at 1305; *Adams*, 340 F.3d at 1107.  The Court has also concluded that plaintiffs have not sufficiently alleged any violation of the securities laws by defendants McCarvel and

_____

[7]In the initial paragraphs of the Complaint, plaintiffs state an intention to bring a § 20(a) claim against Crocs; however, in Count Two, the sole count discussing Section 20(a) claims, plaintiffs only allege liability under this section against defendants Snyder, Case, McCarvel, Crutchfield, and Hammer [Docket No. 87 at ¶¶ 5, 271-276].  More importantly, the Complaint contains no allegations regarding Crocs as a controlling entity.  For this reason, to the extent they have attempted to bring a Section 20(a) claim against Crocs, plaintiffs have failed to state such a claim.

Crutchfield.  Thus, plaintiffs have not satisfied the first element of a prima facie case under Section 20(a) as against persons alleged to be controlling persons of defendants McCarvel or Crutchfield because plaintiffs have not shown a primary violation of the securities laws.  *See Maher*, 144 F.3d at 1305; *Adams*, 340 F.3d at 1107.

## VI.  INSIDER TRADING UNDER SECTION 20A - THE INSIDER TRADING DEFENDANTS (COUNT FOUR)

Section 20A of the Securities Exchange Act of 1934 provides, in relevant part:

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . securities of the same class.

15 U.S.C. § 78t-1(a).  Those appellate courts presented with the issue of whether or not claims under Section 20A require an independent violation of the securities laws have concluded that Section 20A claims "are derivative and therefore require an independent violation of the Exchange Act."  *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697, 703 (2d Cir. 1994) ("the language of the statute is thus quite plain that to state a claim under § 20A, a plaintiff must plead a predicate violation of the '34 Act or its rules and regulations"); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 541 (3d Cir. 1999), *abrogated on other grounds, Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 276-77 (3d. Cir. 2009) ("claims under section 20A are derivative, requiring proof of a separate underlying violation of the Exchange Act") (citations omitted); *Johnson v. Aljian*, 490 F.3d 778, 781 (9th Cir. 2007)  (citations omitted).

The Tenth Circuit has not decided this issue explicitly.  *See Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1194 n.5 (10th Cir. 1998) ("Courts have interpreted § 20A as requiring the plaintiff to plead a predicate violation of the 1934 Act or its rules and regulations . . . we need not discuss whether his § 20A claim should survive the dismissal of his § 10(b) claims") (citations omitted).  Courts in this District have determined that "[a] § 20A claim must be predicated on a separate violation of the 1934 Act or its rules and regulations."  *In re Qwest Commc'n Int'l, Inc. Sec. Litig.*, 396 F. Supp. 2d 1178, 1200 (D. Colo. 2004) (citing *Jackson Natl. Life Ins. Co.*, 32 F.3d at 703); *see also In re Storage Tech. Corp. Sec. Litig.*, 147 F.R.D. 232, 235 (D. Colo. 1993) ("A predicate for a section 20A claim is a violation of the 1934 Securities Exchange Act or the rules and regulations promulgated thereunder") (citations omitted).  The Court agrees with this reasoning and concludes that the statute requires that a Section 20A claim be predicated on a separate violation of the 1934 Securities Exchange Act or its rules and regulations.  *See, e.g., Johnson*, 490 F.3d at 781; *Qwest*, 396 F. Supp. 2d at 1200.  Plaintiffs have brought a Section 20A claim against defendants Snyder, Case, Croghan, Margolis, Marks, McCarvel, Sharp, and Smach.

However, plaintiffs do not allege a separate violation on the part of Croghan, Margolis, Marks, Sharp, or Smach. Therefore, the Court concludes that plaintiffs have not stated a proper Section 20A claim against these defendants.  In addition, the Court has concluded that the allegations of a Section 10(b) violation on the part of Snyder, Case, and McCarvel are not sufficient to state a Section 10(b) claim.  Therefore, the

Court also concludes plaintiffs have not stated a proper Section 20A claim against

Snyder, Case, and McCarvel.

## VII. INSIDER TRADING: JOINT AND SEVERAL LIABILITY AGAINST "TIPPERS" UNDER SECTION 20A(c) -- CROCS AND THE INSIDER TRADING DEFENDANTS (COUNT FOUR)

Section 20A(c) of the Securities Exchange Act of 1934 provides, in relevant part:

> Joint and several liability for communicating. Any person who violates any provision of this chapter or the rules or regulations thereunder by communicating material, nonpublic information shall be jointly and severally liable under subsection (a) of this section with, and to the same extent as, any person or persons liable under subsection (a) of this section to whom the communication was directed.

15 U.S.C. § 78t-1(c). This section makes "tippers," *i.e.*, "those who 'communicate

material, non-public information' to others – jointly liable with their 'tippees' who used

the inside information to trade in violation of the statute."  *In re AST Research Sec.*

*Litig.*, 887 F. Supp. 231, 234 (C.D. Cal. 1995), *aff'd*, 1998 WL 476741 (quoting 15

U.S.C. § 78t-1(c)).  One may become liable for illegal "tipping" only when the inside

information is communicated "outside the company, and even then, only when done for

a personal benefit."  *In re AST Research Sec. Litig.*, 887 F. Supp. at 235 (citing *Dirks v.*

*SEC*, 463 U.S. 646, 662-63 (1983)).  Unless the communication is completely and

unquestionably unrelated to the responsibilities of the employee to the corporation, the

internal communication between corporate employees of corporate information does

not constitute illegal "communicating" for purposes of liability pursuant to Section 20A(c)

[*id.*]

As an initial matter, Section 20A(c) requires a predicate violation of Section 20A. 15 U.S.C. § 78t-1(a), (c).  In support of their Section 20A(c) claims, plaintiffs contend that Crocs is liable for "communicating material, non-public adverse information to certain of the Insider Trading Defendants, which in turn communicated to other insiders" and that the Insider Trading Defendants are liable "by reason of their communication of material, non-public adverse information to other insiders" [Docket No. 87 at ¶¶ 304-305].  Apparently, plaintiffs contend that the insiders are liable for communicating with each other.  To impose liability on insiders for internal communications of corporate information would place an undue burden on a corporation and its employees.  One may become liable for illegal "tipping" only when the inside information is communicated "outside the company." *In re AST Research Sec. Litig.*, 887 F. Supp. at 235.  Plaintiffs do not allege that any of the defendants communicated insider information to any person outside of the company.  Therefore, plaintiffs have not stated a Section 20A(c) claim against any of the defendants.

## VIII.  INSIDER TRADING: CONTROLLING PERSON LIABILITY FOR INSIDER TRADING UNDER SECTION 20A(b)(3) -- THE INSIDER TRADING DEFENDANTS (COUNT FOUR)

Plaintiffs also allege liability on the part of the Insider Trading Defendants for violating Section 20A(b)(3) of the Securities Exchange Act of 1934.  *See* 15 U.S.C. § 78t-1(b)(3).  According to Section 20A(b)(3), "the liability of a controlling person under this section shall be subject to section 78t(a)" [*id.*].  Therefore, anyone who controls another person who engages in insider trading is subject to the liability for controlling persons as stated in Section 20(a), *i.e.*, 15 U.S.C. § 78t(a) [*id.*].

63

The Court has concluded that plaintiffs have failed to state claims of insider trading under Section 20A.  Therefore, plaintiffs' Section 20A(b)(3) claims fail.

## IX.  CONCLUSION

It is ORDERED that:

1.      The Individual Defendants' Motion to Dismiss Plaintiffs' Corrected Consolidated Amended Complaint [Docket No. 108] is GRANTED, and plaintiffs' claims against Peter Case, Raymond Croghan, Scott Crutchfield, Russ Hammer, Michael Margolis, Michael Marks, John McCarvel, Richard Sharp, Thomas Smach, and Ronald Snyder in Counts One and Two and as to Count Four of the Corrected Consolidated Amended Class Action Complaint [Docket No. 87] are dismissed.

2.      The Motion of Defendant Deloitte & Touche LLP to Dismiss Plaintiffs' Corrected Amended Consolidated Class Action Complaint [Docket No. 104] is GRANTED, and Count Three of the Corrected Consolidated Amended Class Action Complaint [Docket No. 87] is dismissed.

3.      Crocs' Motion to Dismiss Plaintiffs' Corrected Consolidated Amended Complaint [Docket No. 107] is GRANTED, and plaintiffs' claims against Crocs in Counts One, Two, and Four of the Corrected Consolidated Amended Class Action Complaint [Docket No. 87] are dismissed.

4.      This case, and all claims asserted therein, is dismissed.  All other motions are denied as moot.

DATED February 28, 2011.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge